# NATIONAL TAXPAYER ADVOCATE 2005 ANNUAL REPORT TO CONGRESS

## EXECUTIVE SUMMARY

### THE MOST SERIOUS PROBLEMS ENCOUNTERED BY TAXPAYERS

Internal Revenue Code § 7803(c)(2)(B)(ii)(III) requires the National Taxpayer Advocate to describe at least 20 of the most serious problems encountered by taxpayers. This year's report describes 21 problems. In each case, the report includes the National Taxpayer Advocate's description of the problem, the IRS's response, and the National Taxpayer Advocate's final comments and recommendations. This format provides a clear picture of which steps have been taken to address the most serious problems and which additional steps the National Taxpayer Advocate believes are required.

The 21 problems described in the report are as follows:

1. **Trends in Taxpayer Service.** As the IRS proposes to allocate more resources to collection, examination, and criminal investigation functions and fewer resources to taxpayer service functions, the IRS is also increasing efforts to "migrate" taxpayers toward electronic services and away from face-to-face contact. Before altering the mix of service and enforcement, the National Taxpayer Advocate believes the IRS should spend more time studying what types of services different taxpayer segments need and how best to deliver these services to help taxpayers remain compliant. The National Taxpayer Advocate recommends that the IRS undertake a research-driven needs-assessment, from the taxpayers' perspective, to help identify what services taxpayers need and want and how best to deliver them. An assessment of needs will also help identify groups of taxpayers that may be resistant to, or unable to access, certain services. Once the IRS conducts a detailed assessment and understands how any proposed changes to taxpayer service may affect compliance, the IRS should develop a detailed strategy for migrating taxpayers from the current to the proposed model of delivering taxpayer service.

2. **Criminal Investigation Refund Freezes.** The IRS Criminal Investigation function (CI), through its Questionable Refund Program (QRP), places a "freeze" on hundreds of thousands of refund claims each year that it believes may contain indicia of fraud. CI personnel currently review the refund claims and "determine" whether they are fraudulent – without notifying taxpayers that their claims are under review and without giving taxpayers an opportunity to present documentation supporting their positions. Last year, the Taxpayer Advocate Service (TAS) received more than 28,000 requests for assistance from taxpayers whose refunds had been frozen. TAS studied a randomly selected sample of nearly 500 cases to determine the ultimate disposition of these cases. When TAS assisted the taxpayers, CI ultimately agreed to issue the full amount of the refund claimed (or more) in 66 percent of the decided cases and to issue a partial refund in an additional 14 percent of the decided cases. Thus, taxpayers received a full or partial refund in 80 percent of frozen-refund cases brought to TAS. The median Adjusted Gross Income (AGI) of these taxpayers was $13,330, and the median refund was $3,519. Thus, the refund constituted, on average, more than 26 percent of the claimant's AGI for the year, and the taxpayers were required to wait, on average, more than 8-1/2 months to receive their refunds. The National Taxpayer Advocate believes that the QRP is an important program to protect against tax fraud, but the IRS must implement procedures to notify taxpayers that their refunds have been frozen, provide taxpayers with an opportunity to submit documentation, and bring cases to a quicker resolution.

**3. The Cash Economy.** Underreported income (and related self-employment tax) from the so-called "cash economy" is probably the single largest component of the "tax gap." It may exceed $100 billion per year. Because income from the cash economy is not subject to information reporting, many of the IRS's traditional means of enforcement are unlikely to be effective in addressing it. The IRS has a number of initiatives that could be effective if coordinated and pursued more aggressively. However, no single function coordinates research, outreach, and compliance initiatives aimed at improving reporting compliance among cash economy participants. Nor does the IRS give these initiatives the same level of attention as other initiatives, such as those addressing tax shelters or the Earned Income Tax Credit (EITC). The IRS must develop a comprehensive strategy for addressing the cash economy if it is to significantly reduce the tax gap.

**4. Training of Private Debt Collection Employees.** In or around July of 2006, the IRS's Private Debt Collection (PDC) initiative will go into operation. The PDC initiative marks a dramatic departure from traditional federal tax collection practice in that private collection firms will now be seeking payment from taxpayers with delinquent accounts, arranging installment agreements, and obtaining taxpayers' financial information over the phone. The National Taxpayer Advocate is concerned about taxpayers interacting with private collection agents who have no understanding of important tax laws and will be trained by the contractors instead of the IRS. With the abundance of tax experts employed at the IRS, it only makes sense to use the IRS's expertise to directly train private collectors at a level that approximates the training received by new IRS collection employees.

**5. EITC Exam Issues.** In the past few years, the IRS has made significant progress in improving the administration of the EITC. Despite this progress, problems still exist for taxpayers subject to EITC examinations and recertification. These problems include delays in exam and recertification procedures, low taxpayer response rates, a lack of standardized treatment in recertification cases, and problems with documentation. The National Taxpayer Advocate recommends that the IRS continue to identify and adopt measures designed to ease the burden on taxpayers and improve the current EITC examination and recertification processes.

**6. Levies on Social Security Payments.** In general, recipients of Social Security benefits are elderly or disabled workers, or the surviving dependents of deceased workers. The IRS continues to process levies on Social Security payments without sufficient managerial review, causing undue burden on a vulnerable population of taxpayers. The National Taxpayer Advocate urges the IRS to implement safeguards that would prevent levies from being imposed on Social Security payments to low income and other at-risk taxpayers.

**7. Appeals Campus Centralization.** The IRS Office of Appeals ("Appeals") has centralized its work on certain types of cases at six IRS campuses; these cases previously were resolved in field offices closer to taxpayers. Appeals campus centralization is aimed at decreasing the time it takes for a taxpayer to resolve a case. While this aim is appropriate and admirable, the National Taxpayer Advocate is concerned that centralizing Appeals case resolution may actually increase taxpayer burden. Centralization may reduce opportunities for taxpayers to have their cases resolved at the local level, diminish working relationships between taxpayers and Appeals employees, increase emphasis on processing at the expense of independent judgment, and diminish service for low income and unrepresented taxpayers. The National Taxpayer Advocate urges Appeals to alleviate these problems and protect taxpayers' appeal rights by developing specific training that will help employees carry out Appeals' independent mission in the campus

environment. We recommend that Appeals monitor campus activity to ensure that taxpayers – particularly low income taxpayers – receive full and fair consideration of their cases and are adequately notified of their right to request a case transfer to a local Appeals office.

8. **Refund Anticipation Loans: Oversight of the Industry, Cross-Collection Techniques, and Payment Alternatives**. Given that a significant percentage of RAL customers are EITC recipients, the IRS has a compelling reason to consider improved oversight of the industry as well as seriously consider alternative refund delivery methods. The IRS contributes to the demand for Refund Anticipation Loans (RALs) by: (1) failing to deliver refunds in the quickest manner possible and (2) failing to provide RAL alternatives for the "unbanked." It is also unclear if RAL customers fully understand the ramifications of cross-collection provisions in standardized RAL contracts, or if customers would even purchase the products if they were adequately informed of the cross-collection practices. The National Taxpayer Advocate recommends that the IRS review the effect of its Revenue Protection Strategy (RPS) on refund turnaround times and work with the Department of Treasury to develop alternative means of delivering refunds to taxpayers.

9. **Identity Theft.** Identity theft occurs when someone uses another individual's personal information without permission to commit fraud or other crimes. Although the most common type of identity theft involves consumer fraud, an increasing number of identity theft victims find they need to contact the IRS to untangle their tax accounts. The National Taxpayer Advocate urges the IRS to resolve the tax issues faced by victims of identity theft more quickly and efficiently, which may require coordination between the IRS and other federal agencies.

10. **Complexity of the Employment Tax Deposit System.** The Internal Revenue Code places significant responsibilities on employers for depositing, reporting, filing, and paying employment taxes. Recent data shows that the IRS assesses failure to deposit (FTD) penalties on one out of every 16 employment tax returns, yet eventually abates more than 60 percent of the FTD penalty amounts it originally assessed. This suggests that the rules and regulations governing federal employment tax deposits are overly complex, presenting significant compliance problems for employers and administrative challenges for the IRS.

11. **Automated Collection System Levy Releases.** Collection efforts through the IRS's Automated Collection System (ACS) can result in levies of bank accounts, wages, or other income such as Social Security. In response to these levies, taxpayers will contact the IRS seeking to enter into a collection alternative, such as an installment agreement. The IRS can also designate an account as "currently not collectible" if the taxpayer can demonstrate a financial hardship. The Internal Revenue Code and Treasury Regulations require that the IRS promptly release levies when taxpayers enter into installment agreements or when they demonstrate the existence of a hardship. Some taxpayers encounter problems with the levy release, including clerical errors, delays that result in additional levies on taxpayer assets or income, or the IRS not returning levy proceeds when a delayed levy release results in additional levies. Delays are also due in part to taxpayers' failure to request expedited levy releases so that the release can be faxed to the third party levy source. The IRS has improved the levy release process for currently-not-collectible accounts and has agreed to consider similar system changes for installment agreements, and require additional training for employees. We encourage the IRS to consider revising its procedures so that all levy releases are assumed to require expedited procedures.

**12. Regulation of Electronic Return Originators.** Electronic Return Originators (EROs), along with return preparers, are taxpayers' entry point into the tax system and have unprecedented access to taxpayers' financial data and social security numbers. As such, EROs should be closely monitored to protect taxpayers, but the IRS's current regulation of EROs is minimal. The National Taxpayer Advocate recommends the IRS increase its efforts, in part by making more visits to EROs, tracking EROs that are not filing any tax returns, and requiring those non-active EROs to recertify. The National Taxpayer Advocate further recommends that the IRS consolidate end-to-end responsibility for EROs, from approval of applications to monitoring ERO activities, in one IRS organization and develop a long-term strategic plan for the e-file program and EROs to ensure adequate and effective oversight.

**13. Limited Scope of Backup Withholding Program.** Underreporting of individual income tax is the single largest source of the tax gap, accounting for over half of the gross tax gap. Backup withholding is one of the tools available to the IRS as it attempts to narrow the gap. The IRS has the authority to require payors to deduct and withhold tax under certain conditions, such as when a recipient fails to furnish a valid Taxpayer Identification Number. However, the IRS has not implemented the backup withholding program effectively and has failed to provide noncompliant taxpayers with sufficient incentive to fulfill their reporting obligations.

**14. Accessibility of e-Services for Tax Practitioners.** The IRS's web-based e-Services suite is available to tax practitioners who are active participants in the IRS e-file program and electronically file five or more accepted individual income tax returns in a filing season. The IRS uses e-Services "as a reward and incentive for e-filing" rather than addressing it from a customer service-oriented perspective. This policy of limiting access to e-Services deprives many highly trained and experienced tax practitioners of an extremely useful and efficient tool, and has the unintended result of making the Electronic Account Resolution program available to preparers without regard to their professional qualifications. The National Taxpayer Advocate recommends that the IRS provide access to e-Services to all practitioners qualified to practice before the IRS pursuant to Circular 230. She also recommends that the IRS expand access to the Transcript Delivery System in e-Services to all taxpayers, while taking the necessary security measures to safeguard confidential tax data on the Internet.

**15. Mandatory Briefings for IRS Employees on TAS.** Internal Revenue Code § 7803(c)(2)(C)(ii) requires the National Taxpayer Advocate to develop guidance for all IRS officers and employees, outlining the criteria for referral of cases to the Taxpayer Advocate Service (TAS). The IRS has denied the request of the National Taxpayer Advocate to include TAS training among its annual mandatory briefings for all employees. Instead, the IRS has agreed to provide TAS training to contact employees in the Wage and Investment and Small Business/Self-Employed operating divisions on a one-time basis, and urges TAS to train the rest of the employees through methods such as the IRS intranet, inserts in employee Earnings & Leave statements, and "wallet cards." The National Taxpayer Advocate urges the IRS to rethink its position and grant her request to make TAS training mandatory for all employees.

**16. Allowable Expense Standards for Collection Decisions.** Each year the IRS publishes schedules of national and local expense allowance standards. These standards reduce the subjectivity involved when IRS employees consider the collection alternative to pursue when a taxpayer is having difficulty paying the IRS (*e.g.*, an offer-in-compromise, installment agreement, or suspension of collection). However, for any given taxpayer, the expense amounts provided by the standards will not necessarily cover his or her reasonable basic living expenses. The IRS relies on the subjective judgment of its employees to allow more than the

standard amounts when appropriate. Many practitioners report that the IRS often fails to allow such additional amounts and uses the standards as an excuse to reject reasonable collection alternatives. Our report discusses a number of reasons that the standards are often inadequate and provides recommendations for improving them, encourages IRS employees to allow additional amounts when appropriate, and addresses practitioner concerns.

**17. Inadequate Taxpayer Service to Exempt Organizations, Resulting in Unnecessary Penalties.** Most tax exempt organizations are very small entities with meager resources and modest budgets that rely largely on the services of volunteers. Tax filing requirements for these organizations are complicated and time consuming. The IRS automatically assesses penalties on these organizations when they do not comply precisely with these complex requirements. Over the last 13 fiscal years, however, the IRS has abated almost 75 percent of the dollars assessed for filing-error penalties on exempt organizations because the organizations later corrected their mistakes. This high abatement rate is an unnecessary waste of IRS resources and indicates that exempt organizations would avoid filing errors if better informed of their filing obligations. Currently, however, the IRS substantially underfunds customer service to exempt organizations; for example, only 60 percent of organizations that call the IRS Tax Exempt and Government Entities Division toll-free help line receive service. The National Taxpayer Advocate urges the IRS to reconsider its funding decisions with respect to exempt organization customer service and better utilize the resources available.

**18. Direct Deposit of Income Tax Refunds.** Under present law, there are no procedures for the IRS, the government's Financial Management Service, and financial institutions to address inadvertent errors by taxpayers relating to direct deposits of tax refund checks. The taxpayer and the financial institution must resolve any dispute over the accuracy of a direct deposit refund, with little assistance from the IRS. The National Taxpayer Advocate recommends that the IRS consider all of the recommendations put forth by the Direct Deposit Task Force as well as other procedural improvements that can eliminate the potential for a misdirected direct deposit refund. The National Taxpayer Advocate also encourages the IRS to continue to work with financial institutions in an effort to recover misdirected funds.

**19. Innocent Spouse Claims.** One spouse (called the "innocent spouse") may apply to the IRS for relief from joint liability for deficiencies or underpayments attributable to the other spouse. The IRS has difficulty communicating with taxpayers regarding the requirements for relief and how to fill out related forms. As a result, the IRS is able to grant fewer than three in ten requests for relief, and despite recent cuts in processing time, the IRS collectively takes more than two years to process requests that are appealed. Various IRS computer systems contain inconsistent information about innocent spouse claims processed by the Appeals function. These inconsistencies make it more difficult for the IRS to identify the source of any processing delays.

**20. Limitations of Collection Account Databases.** The lack of access to full taxpayer account histories in one place makes it difficult for IRS contact employees to respond to taxpayers' questions or provide proper guidance on potential case resolutions. This inaccessibility often leads taxpayers to seek the assistance of the Taxpayer Advocate Service. The Desktop Integration (DI) system provides IRS employees with greater access to the information needed, but not all systems interface with DI and not all IRS employees are required to use DI. The National Taxpayer Advocate urges the IRS to expand the number of systems interfacing with DI as well as requiring all IRS contact employees to use DI.

**21. Reasonable Cause Assistant (RCA).** The IRS does not utilize the Reasonable Cause Assistant (RCA) program -- a computer-based decision support tool -- for all determinations of penalty abatements for reasonable cause. In addition, the high rate of RCA abatement conclusions indicates that the IRS needs to eliminate unnecessary penalty assessments. Because existing IRS data does not sufficiently differentiate RCA cases from non-RCA cases, the IRS cannot effectively analyze the penalty systems in place. The low rate at which RCA users abort the program's conclusions may indicate that RCA does not encourage users to override an RCA decision even when appropriate. The National Taxpayer Advocate urges the IRS to review RCA and all related training and guidance materials to determine whether the application actually gives the user the flexibility to fully consider unique facts and circumstances.

## LEGISLATIVE RECOMMENDATIONS

Internal Revenue Code § 7803(c)(2)(B)(ii)(VIII) requires the National Taxpayer Advocate to recommend legislative changes to resolve problems encountered by taxpayers. This report includes seven proposals classified as Key Legislative Recommendations and three proposals classified as Additional Legislative Recommendations.

### KEY LEGISLATIVE RECOMMENDATIONS

**Tax Reform Core Principles: A Taxpayer-Centric Approach**. Two months ago, the President's Advisory Panel on Federal Tax Reform submitted a report to the Secretary of the Treasury proposing significant revisions to the Internal Revenue Code, and it appears that Congress may give serious consideration to fundamental tax reform in the next year or two. We recommend that Congress give priority emphasis to six core principles as it considers various tax-reform proposals: (1) the tax system should not "entrap" taxpayers; (2) the tax laws should be simple enough so that taxpayers can prepare their own returns without professional help, simple enough so that taxpayers can compute their tax liabilities on a single form, and simple enough so that IRS telephone assistors can fully and accurately answer taxpayers' questions; (3) the tax laws should anticipate the largest areas of noncompliance and minimize the opportunities for such noncompliance; (4) the tax laws should provide some choices, but not too many choices; (5) the tax laws should not necessarily avoid refundable credits but, if it includes them, should design them in a way that is administrable; and (6) the tax system should incorporate a periodic review of the tax code – in short, a sanity check.

**Measures to Reduce Noncompliance in the Cash Economy**. The IRS estimates that the annual federal tax gap for 2001 was between $257 billion and $298 billion. The IRS receives about 130 million income tax returns each year. Thus, every taxpayer is forced to pay an average $2,000 "surtax" each year to subsidize noncompliance. IRS data show that the highest rate of noncompliance by far is attributable to transactions that are not reported to the IRS on a Form W-2, Form 1099, Schedule K-1, or similar form. These unreported transactions occur largely in the so-called "cash economy." To reduce the tax burden on compliant taxpayers, we recommend that Congress (1) create a three-pronged reporting and payment system that encourages compliance in certain cash economy transactions by (a) instituting backup withholding on payments to taxpayers who have demonstrated "substantial noncompliance"; (b) releasing backup withholding on payments to "substantially noncompliant" taxpayers who have demonstrated "substantial compliance" and agree to schedule and make future estimated tax payments through the IRS Electronic Funds Transfer Payment System (EFTPS); and (c) providing that payors will not be required to institute backup withholding on payments to independent contractors that present payors with a valid IRS "compliance certificate"; (2) require the IRS to promote the making of estimated tax payments through EFTPS; (3) authorize voluntary withholding agreements between independent contractors and service recipients; and (4) require third-party information reporting for certain payments to corporations with 50 or fewer shareholders.

**Tax Reform for Families: A Common Sense Approach**. The Internal Revenue Code contains six provisions related to a taxpayer's family status: the Earned Income Tax Credit (EITC), the Child Tax Credit (CTC), the Child and Dependent Care Credit, personal and dependency exemptions, the head-of-household filing status, and the "separated spouse" rules of IRC § 7703(b). Each of these six provisions directly or indirectly confers a tax benefit on taxpayers who meet the various eligibility requirements, and at least one of these six provisions impacts every U.S. individual taxpayer. To build upon the recently enacted Uniform Definition of Child and to further simplify the family status provisions, we recommend that Congress (1) combine the exemptions, CTC, and part of the EITC and head of household filing status into a refundable Family Credit comprising two components – one for the taxpayer (and his or her spouse) and one for whomever is the "main carer" of a child or children based on a per-child amount; (2) separate the Child and Dependent Care Credits into two credits; (3) eliminate head-of-household filing status; (4) modify the EITC so that it provides a refundable credit to low income workers based solely on the taxpayer's earned income and is available to workers age 18 and over, regardless of the existence of children in the household; (5) permit married taxpayers who have a legal and binding separation agreement and who live separate and apart as of the last day of the calendar year to be considered "not married" for purposes of filing status; and (6) provide a separate credit for noncustodial parents of Qualifying Children who pay all child support obligations due for that calendar year.

**Another Marriage Penalty: Taxing the Wrong Spouse**. The federal income tax liabilities of married persons are often imposed on or collected from a spouse who did not earn the income subject to tax, *i.e.*, the "wrong" spouse. Current law provides some relief to a spouse held liable for tax on the other spouse's income, at least in cases where the first spouse did not know about the income and did not significantly benefit from it. However, the relief rules are sometimes overly narrow, complex, costly for the IRS to administer, and burdensome for taxpayers. Even if relief rules apply so that one spouse is not liable for his or her spouse's tax, the IRS may be able to *collect* the liability from the non-liable spouse in community property states. We recommend that Congress amend the law to tax the "right" spouse in the first instance and to prevent the IRS from undermining this rule through its collection efforts. Our recommendation would better align each person's tax with his or her individual ability to pay, significantly reduce complexity, and minimize the impact of state property and collection laws that subject taxpayers to different amounts of federal income tax solely because they reside in different states.

**Requiring Brokers to Track and Report Cost Basis for Stocks and Mutual Funds**. Many financial institutions through which investors own stocks and mutual funds ("brokers") do not currently keep track of an investor's basis in the stocks or mutual funds, and no brokers report basis information to both taxpayers and the IRS on a Form 1099-B. The absence of information reporting creates serious problems for many taxpayers and the government alike. For taxpayers, tracking basis can be extraordinarily complex and many taxpayers seeking to comply with the law find that they simply cannot do so with accuracy, leaving them exposed if audited. From the government's perspective, the absence of information reporting enables underreporting by taxpayers who deliberately overstate their basis (thereby reducing their gain or even generating a loss), because they know the IRS generally cannot detect errors in basis reporting in the absence of an audit. One recent estimate puts the revenue loss to the government from such underreporting at $250 billion over the next 10 years. We recommend that brokers be required to keep track of an investor's basis, transfer basis information to a successor broker if the investor transfers the stock or mutual fund holding, and report basis information to the taxpayer and the IRS (along

with the proceeds generated by a sale) on Form 1099-B. To offset the cost of implementing a tracking system, we note that Congress could provide a one-time tax credit for brokers.

**Tracking Cost Basis as a Result of Estate Tax Repeal**. Under the current estate tax regime, persons acquiring property from a decedent are able to use a "stepped-up" basis equal to the fair market value of the property at the date of the decedent's death (or, if they so elect, on the date six months after the decedent's death). Once the estate tax is repealed in 2010, these taxpayers must use the modified carryover basis, which may require extremely complex calculations to determine the property's adjusted basis in the hands of the decedent just prior to death. Reconstructing adjusted basis in property is difficult enough while taxpayers holding such assets are alive; after death, it can become impossible. Congress should explore ways to lessen this compliance burden.

**Restructuring and Reform of Collection Due Process Provisions**. Collection Due Process (CDP) hearings afford taxpayers the opportunity to obtain meaningful review of IRS collection actions by an impartial IRS Appeals Officer and the courts, either after the initial filing of a Notice of Federal Tax Lien or before an initial levy on a taxpayer's assets. The current statutory CDP rights are both under-inclusive and over-inclusive, denying judicial review of some lien and levy actions while encouraging counterproductive behavior on the part of some taxpayers and the IRS. To enhance taxpayer protections in the tax collection process while ensuring that the IRS's ability to collect the correct amount of tax is not unreasonably impaired, we recommend that Congress (1) require the IRS to issue a separate CDP Right to Hearing notice at the time it undertakes the first levy action with respect to a tax, describing with specificity the levy source and date such levy will occur and providing the taxpayer with the name and contact information of an IRS employee to call about the levy action; (2) consolidate judicial review of CDP hearings in the United States Tax Court, clarify the role and scope of Tax Court oversight of Appeals' continuing jurisdiction over CDP cases, and address the Tax Court's standard of review for the underlying liability in CDP cases; and (3) codify both the IRS Collection Appeals Program and the IRS Audit Reconsideration Process and specifically include Audit Reconsideration as an alternative to be considered at CDP hearings.

ADDITIONAL LEGISLATIVE RECOMMENDATIONS

**Direct Deposit of Income Tax Refunds**. Under present law, there are no procedures in place for the IRS, the government's Financial Management Service, and financial institutions to address inadvertent errors by taxpayers relating to direct deposits of tax refund checks. Disputes over the accuracy of a direct deposit refund due to taxpayer or preparer error must currently be resolved between the taxpayer and the financial institution itself, with little assistance from the IRS. The National Taxpayer Advocate recommends that Congress amend the Internal Revenue Code to create a process through which the IRS and financial institutions work together to identify the incorrect recipient of a direct deposit refund and require the return of the improperly deposited funds.

**Social Security Levies.** Current law exempts from IRS levy certain pension and annuity payments (including payments under the Railroad Retirement Act), but it does not exempt from levy retirement, survivors, and disability insurance payments made under the Social Security Act. Levies by the IRS on Social Security benefits can cause particularly severe hardships for low income taxpayers who rely on these payments as their primary or sole source of income. The National Taxpayer Advocate recommends that Congress exempt Social Security payments altogether from IRS levy. In the alternative, the National Taxpayer

Advocate recommends that Congress extend the exemption amount applicable to manual levies to automated levies under the Federal Payment Levy Program.

**Debt Collection Techniques on EITC Benefits by the Refund Anticipation Loan Industry**. Refund anticipation loan (RAL) customers may not completely understand the ramifications of the debt offset collection provisions included in standardized RAL contracts. The provisions give the contracting financial institution or bank the authority to offset RAL proceeds to satisfy outstanding delinquencies owed on RALs previously issued by either the contracting bank or a third-party bank. The practice allows banks to effectively seize EITC benefits and transfer the funds to themselves or third-party banks to satisfy these prior delinquencies. The National Taxpayer Advocate recommends that Congress amend IRC § 32 to prohibit banks from exercising their right to set off on EITC benefits, a protection that currently exists for Social Security benefits. At the very least, the law should prohibit banks from transferring any portion of a federal tax refund representing the EITC to a third-party bank.

## THE MOST LITIGATED TAX ISSUES

Internal Revenue Code § 7803(c)(2)(B)(ii)(X) requires the National Taxpayer Advocate to identify the ten tax issues most often litigated in the Federal courts and to classify those issues by the type of taxpayer affected. The cases we reviewed were decided during the fiscal year that began on June 1, 2004, and ended on May 31, 2005. Our analysis of issues and cases for this year's report suggests that tax law complexity is a significant cause of tax litigation and constitutes a continuing burden on both taxpayers and the government.

**Appeals from Collection Due Process Hearings under IRC §§ 6320 and 6330.** Collection Due Process (CDP) hearings provide taxpayers an opportunity for independent review of the first lien filed by the IRS or the first proposed levy action with respect to a tax liability. As in 2003 and 2004, CDP was the most frequently litigated tax issue in the federal courts. We reviewed 209 decisions during the current period. Our analysis shows that collection alternatives were litigated more than any other such issue in these cases (40 out of 209 cases). Taxpayers prevailed in five cases. Taxpayers also attempted to litigate the underlying liability in 39 cases; however, in 26 cases the courts ruled that taxpayers were unable to litigate that issue because they had another opportunity to do so earlier in the process.

**Gross Income under IRC § 61 and Related Sections.** The issue of what constitutes gross income for purposes of Internal Revenue Code (IRC) § 61 has been among the Most Litigated Issues since 1998, the first year that the National Taxpayer Advocate was required to report on litigated issues. Gross income is again the second most litigated issue this year. The cases generally fell into one of four categories: (1) awards or settlements, (2) disability and Social Security income, (3) constructive dividends, and (4) unreported income. Taxpayers prevailed, in whole or in part, in 25 out of 108 cases. While no clear patterns are evident, taxpayers appeared to have the most difficulty in cases where other sections of the Internal Revenue Code exclude income items that would otherwise be taxable.

**Failure to File Penalty under IRC § 6651(a)(1).** The number of cases involving the failure to file penalty under IRC § 6651(a)(1) increased by 60 percent from last year to make this the third most litigated issue. We reviewed 75 cases involving the failure to file penalty in federal courts. Taxpayers seek relief from the penalty by asserting "reasonable cause" for the failure to file a timely return. Taxpayers argued that varying excuses constitute reasonable cause, including illness of the taxpayer or family member, reliance on a tax professional, reliance on a spouse, or ignorance of the law. Taxpayers prevailed in five of 75 cases (7 percent).

**Trade or Business Expenses under IRC § 162 and Related Code Sections.** The deductibility of trade or business expenses is perennially one of the ten most litigated tax issues in the federal courts. We reviewed 67 cases that included trade or business expense issues. The courts affirmed the IRS position in nearly 75 percent of the cases, while taxpayers prevailed just seven percent of the time; the remaining cases resulted in split decisions. Substantiation of trade or business expenses was the primary sub-issue litigated by taxpayers, who often failed to provide sufficient documentation of expenses they incurred, causing them to lose otherwise permissible deductions. The IRS can assist these taxpayers,

and minimize litigation, by continuing to provide clear guidance on the deductibility of trade or business expenses.

**Frivolous Issues Penalty under IRC § 6673.** We reviewed 67 cases in which taxpayers litigated the IRC § 6673 penalty for advancing frivolous arguments or conducting litigation solely for delay. This represents a 90 percent increase over last year's 35 cases. In these cases, the Tax Court considers whether taxpayers' arguments or actions warrant application of the penalty. IRS counsel can move for imposition of the penalty or the court can do so on its own initiative. Courts consistently held that penalties were warranted where the same type of "boilerplate" arguments had been held by other courts to be frivolous, having no basis in law or fact. The increase in these cases suggests that the IRS is more willing to seek imposition of the penalty and courts are more willing to sustain it.

**Negligence Penalty under IRC § 6662(b)(1).** We reviewed 57 cases involving the accuracy-related penalty under IRC § 6662(b)(1). This penalty is assessed against taxpayers for underpayment of tax due to the taxpayer's negligence or disregard of tax rules or regulations and was generally decided in conjunction with other issues. The IRS prevailed in 39 cases (or 68 percent), while taxpayers prevailed in 13 cases (23 percent), and five cases ended in split decisions. A common reason for rulings against taxpayers was the lack of any evidence that there was reasonable cause and the taxpayers acted in good faith. However, the taxpayer victories raise the question of whether the IRS always exercises proper oversight on the imposition of the negligence penalty. The IRS abates a large percentage of other types of penalties. This fact and the relatively significant number of taxpayers who prevailed on reasonable cause indicate that the IRS should study whether the accuracy-related penalty is achieving its original goal of promoting voluntary compliance by encouraging accurate tax returns.

**Family Status Issues under IRC § 2, 21, 24, 32, and 151.** The Earned Income Tax Credit (EITC), dependency exemption, head of household filing status, child tax credit, and child and dependent care credit frequently arise in the same cases and involve similar factual determinations. We reviewed 45 cases concerning these issues, two-thirds of them dealing with multiple credits and issues where the determination of one issue often affected others. Our analysis shows that taxpayers who wish to claim the family status credits and deductions often do not understand the qualification requirements or how to properly satisfy them. Taxpayers were represented by counsel in only six of the 45 cases, even though many were highly fact-specific and involved a complicated web of statutory provisions.

**Relief from Joint and Several Liability under IRC § 6015.** Spouses filing joint federal income tax returns are jointly and severally liable for any deficiency or tax due. IRC § 6015 provides three avenues for relief from joint and several liability. We reviewed 45 federal court opinions involving relief under IRC § 6015, with 33 cases decided in favor of the IRS, 11 in favor of the taxpayer, and one split decision. While the courts considered many factors in determining the appropriateness of relief, the most significant was whether the requesting taxpayer had actual or constructive knowledge of the tax deficiency. Taxpayers' success or failure often turns on their willingness and ability to provide documentation to support their claims.

**Summons Enforcement under IRC § 7604.** The IRS has the authority to summon the production of books, records, or testimony from witnesses when investigating either a civil or criminal tax liability. The court ruled in favor of the IRS in 42 of the 44 cases reviewed, while a taxpayer prevailed in one case and another ended in a split decision. In at least nine of the

cases, the summons in question was issued to third parties who the IRS believed were marketing unlawful tax shelters to taxpayers, reflecting the IRS's increased attention to shelter activity. As the IRS becomes more aggressive in its enforcement initiatives, it will likely increase its use of the summons enforcement tool, and the courts will see a growing number of these cases.

**Trust Fund Recovery Penalty under IRC § 6672.** The Trust Fund Recovery Penalty is a means by which the government holds certain persons responsible for willfully failing to withhold or remit the trust fund portion of payroll taxes. We reviewed 34 opinions in which the TFRP was an issue. Taxpayers prevailed in whole or in part in 13 of the 34 cases, though in three cases the court was denying the IRS's motion for summary judgment, thereby requiring the parties to go to trial. The cases often involved officers of small businesses who had some role in determining expenditures. As one court noted, these cases often reflect the difficult choices for corporate officers who are faced with the dilemma in a struggling business between losing one's job or violating the nation's tax laws. Still, these choices do not excuse the responsibility of paying payroll taxes.